THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) No. 18 CR 460 |
| v. | ) |
| | ) Judge Jorge L. Alonso |
| PETRONILO TERRAZAS, | ) |
| | ) |

## Memorandum Opinion and Order

Petronilo Terrazas ("Defendant") was indicted on one count of knowingly and intentionally possessing, with an intent to distribute, a controlled substance in violation of 21 U.S.C. § 841(a)(1). On February 13, 2018, drug enforcement officers pulled over the Defendant as he drove westbound on North Avenue in Melrose Park, Illinois. Officers searched Defendant's vehicle and recovered three bricks of cocaine from a natural void on the floor of Defendant's car near the center console. Defendant filed a motion to suppress the underlying arrest and any evidence gathered from it, arguing that the arrest and subsequent search violated the Fourth Amendment. The Court finds that the officers had reasonable suspicion to conduct an investigatory stop and that the Defendant consented to the search of his vehicle. Therefore, the Court denies Defendant's motion to suppress [119].

## Background

After an evidentiary hearing and full briefing on the issue, the Court makes the following factual findings. In January of 2017, the Drug Enforcement Administration ("DEA") began investigating a kilogram-quantity narcotics trafficker named Juan Martinez Cruz ("Martinez"). On January 26, 2018, the Chief Judge for the Northern District of Illinois signed an order authorizing DEA agents to intercept wire and/or electronic communications: (1) to-and-from a

phone used by Martinez, and (2) to-and-from a phone used by Gaudencio Jaramillo Torres ("Jaramillo"), Martinez's associate. This long-term wiretap consisted of a team of eight to ten police officers and DEA agents. The DEA's investigation revealed that Martinez obtained kilogram quantities of narcotics from a Mexico-based supplier known as "Bolas." Martinez would then return the proceeds from the sale of those products to Mexico through multiple U.S.-based couriers that Bolas directed him to.

On January 29, 2018, DEA agents intercepted a series of calls and text messages between Martinez and Bolas. Although somewhat coded, agents deciphered these communications and believed that Martinez and Bolas arranged for Martinez to drop off narcotics proceeds to a courier the next day. Later on the same day, agents intercepted a text message that Martinez sent to a phone number ending in -7189 (later identified as belonging to Ulises Valentin Surillo ("Valentin")) in which Martinez contacted Valentin to pick up narcotics. The next day, agents intercepted further communications between Martinez and Valentin arranging a time and place to meet.

### I.     Martinez Meets Valentin

Agents went to the location identified in the intercepted messages but could not see the transaction between Martinez and Valentin. The agents did, however, intercept communications from Martinez telling Valentin that he drove a "white Suzuki" and observed Martinez driving this vehicle at the time of the call. Later that evening, agents intercepted communications between Martinez and Bolas confirming that Martinez and Valentin completed the transaction. Based on these communications, agents surmised that Martinez exchanged $45,000-$50,000 for approximately 2 kilograms of narcotics (the messages do not confirm the precise amounts of narcotics or money).

Approximately one week later, Martinez again met with Valentin to deliver $23,000 in narcotics proceeds. After intercepting messages arranging the meet, agents observed the transaction. Agents saw Martinez drive to an apartment complex, exit his car, and meet briefly with Valentin. Before leaving, agents saw Valentin exit his car and walk around to the front-side passenger door. Agents observed him open the door, kneel down, reach toward the floorboard, and do something near the floorboard before returning to the driver's seat and driving away. After this meeting, agents intercepted calls between Martinez and Bolas confirming that a narcotics transaction had occurred.

## II. Martinez Meets Guzman

On February 12, 2018, agents intercepted a string of communications between Martinez and Bolas where they discussed an upcoming drug transaction. After these discussions, Martinez received a call from a phone number ending in -3303—later believed to belong to Aureliano Guzman-Alamo ("Guzman"). During the call, Guzman stated, "How are you? I'm calling on behalf of Fidel…I'm calling to ask if we can grab a bite to eat." Agents believed this call set up another drug exchange. Martinez and Guzman agreed to meet at a restaurant in Melrose Park the next day. In a call later that same day, Martinez and Bolas confirmed the amount of narcotics that Martinez would receive, with Bolas telling him, "Look, they are going to give you the same amount, four."

The next day, February 13, 2018, at approximately 2:20 pm, agents intercepted another call between Martinez and Guzman. Martinez agreed to meet Guzman at the Winston Plaza in Melrose Park and to call Guzman once he arrived. Agents followed Martinez to the Winston Plaza. Upon arriving, Martinez called Guzman to check his location, to which Guzman responded that he would be there in 5 minutes. At approximately 3:13 p.m. Guzman called

Martinez and told him he was in a grey truck. Martinez located Guzman's vehicle and conveyed his position to Guzman. Agents then observed Guzman's truck pull up next to Martinez's vehicle and Martinez exit his vehicle. Martinez opened the passenger-side door of Guzman's truck, interacted briefly with Guzman, and then returned to his vehicle. Guzman left, but Martinez remained for a few additional minutes. He exited his car again and walked to the rear driver-side door, where agents observed him appear to adjust something near the car's floorboard. Once finished, Martinez returned to the driver's seat and departed. Agents maintained primary surveillance on Guzman.

### III.    Guzman Meets Defendant

After the meeting between Martinez and Guzman, agents followed Guzman from the Winston Plaza as he returned to a residence at 10118 W. Lyndale Avenue in Melrose Park, IL. Guzman pulled into the driveway and drove to the residence's rear, exited his car, and went inside for approximately five minutes before returning to his truck and leaving the residence. Agents followed Guzman as he drove to a parking lot at the intersection of Armitage and 25th Avenue in Melrose Park. Agents observed Guzman meet with an individual driving a black and tan Ford F-150—later identified as the Defendant Petronilo Terrazas. Agents observed the Defendant interact briefly with Guzman, exit his car, and appear to adjust something near the floor of the driver's seat. Defendant then returned to the driver's seat and closed the door. Agents did not specifically observe any objects passed between Defendant and Guzman. Defendant and Guzman both left the area without patronizing any of the surrounding businesses. Agents confirmed that Guzman returned to the residence and, therefore, maintained primary surveillance on Defendant.

## IV.     Agents Stop Defendant

At approximately 3:45 p.m.—a few minutes after Defendant left the parking lot—Task Force Officers Robert Boehnke and Douglas Savarino initiated a stop of Defendant's vehicle. Officer Boehnke works as a police officer for the Village of Bolingbrook detective and has done so for the last 18 and a half years. He also worked as a task force officer for the DEA since January of 2016. Likewise, officer Savarino has served as a police officer for 20 and a half years, including as a task force officer (he started working for the DEA before the stop in this case). Both had training in basic surveillance and narcotics investigations.

These officers stopped Defendant as he drove westbound on North Avenue in Melrose Park. Officers concede that they did not pull over the Defendant for a traffic violation and that the Defendant did not have any outstanding warrants in his name. The officers drove covert vehicles, meaning that the cars were unmarked and did not possess dash cameras. The officers wore plain clothes and did not have body cameras but did put on bulletproof vests that identified them as police (but not DEA).

After Defendant pulled over, officers approached his vehicle and asked him to exit the car. Defendant complied, and Officer Savarino escorted him to the vehicle's rear on the side of the road between the Defendant's car and the officers' vehicles and out of the immediate vicinity of traffic. Officer Savarino then asked Defendant, in English, for consent to search the car. Defendant provided consent. Officer Boehnke didn't hear the Defendant give consent to Savarino—he walked around the vehicle surveying it while Savarino asked Defendant—but came to the vehicle's rear and also asked the Defendant, again in English, for consent to search the vehicle. Defendant consented again.

5

By this time, other officers had responded to the scene and Officer Boehnke and another officer searched the Defendant's vehicle. Officer Boehnke searched the driver-side seat area and removed a panel near the center consol. Reaching inside, Boehnke could feel an object inside the console void. Going around to the passenger-side, Boehnke recovered three brick-shape packages wrapped in black tape with one blue piece of tape wrapped around the center. Officer Savarino transported the bricks to the DEA Chicago Field Division, which field tested positive for cocaine. Officers detained Terrazas and transported him to the Stone Park Police Department. At approximately 4:54 p.m., another officer read Defendant his Miranda rights. Defendant requested an attorney, and after obtaining some biographical information, officers released Defendant without charges. Before that, Officer Savarino obtained the biographical information from Defendant, which was captured on video surveillance camera (with audio).

## Discussion

Defendant moves to suppress his arrest and the evidence obtained from the search of his vehicle, arguing that: (1) officers did not have reasonable suspicion to conduct an investigatory stop, (2) the investigatory stop exceeded the scope allowed by *Terry v. Ohio*, 392 U.S. 1 (1968), (3) even if officers had reasonable suspicion at some point, the stop was unconstitutional due to intervening circumstances that required a finding of probable cause, and (4) Defendant did not consent to a search of his vehicle. Because the Court finds that the Defendant consented to a search of his vehicle, the Court need not consider arguments two and three. Therefore, the Court addresses arguments one and four in turn.

I.    **Reasonable Suspicion**

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. Amend. IV. The Seventh Circuit has articulated three basic categories of police-citizen

interactions: (1) an arrest, which requires probable cause to believe a person has committed a crime, (2) an investigatory stop, which is limited to a brief, non-intrusive detention, and (3) interactions that do not implicate the Fourth Amendment because no detention occurs, but rather the officer seeks the citizen's voluntary cooperation. *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015). The stop in this case invokes the second category. After being pulled over, officers did not arrest the Defendant—officers did not restrain him or tell him he was under arrest—nor was Defendant free to leave as the officers conceded during their testimony.

To conduct an investigatory stop, a police officer must have "at least [an] articulable and reasonable suspicion" that the particular person stopped is breaking the law. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). To meet the reasonable-suspicion standard, an officer must have "a particularized and objective basis" for suspecting the persons detained of breaking the law. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Although reasonable suspicion "embodies something less than probable cause," it necessitates something more than a hunch or inchoate suspicion. *United States v. Wilbourn*, 799 F.3d 900, 909 (7th Cir. 2015). The officer, therefore, must point to specific and articulable facts that, taken together with rational inferences, reasonably warrant the intrusion. *Terry*, 392 U.S. at 21.

When evaluating reasonable suspicion, courts must consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Courts cannot take a "divide-and-conquer" approach that examines each factor supporting reasonable suspicion in isolation. *District of Columbia v. Wesby*, –U.S.–, 138 S. Ct. 577, 588 (2018). This does not bar courts from discussing factors separately. *See, e.g.*, *Wesby, id.* at 586-88 (discussing each factor supporting probable cause separately before considering the combined effect of those factors). Rather, it merely "requires that courts consider the reasonable inferences that a law

7

enforcement officer could draw from the objective facts in combination." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018).

Applying that standard here, the Court finds that officers knew of several facts that support a finding of reasonable suspicion. First, the communications between Martinez and Bolas and the meeting between Martinez and Guzman color the interaction between Guzman and the Defendant and added to the circumstances known to the officers at the time that they stopped the Defendant. *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981) ("Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."). Before the Guzman-Defendant meeting, officers suspected that Martinez was involved in drug trafficking. They intercepted messages through a wiretap between Martinez and Bolas arranging an upcoming drug transaction. They also intercepted messages between Martinez, Bolas, and Valentin arranging and confirming a narcotics transaction that took place on January 29, 2018. Roughly one week later, officers intercepted more messages confirming that Martinez delivered $23,000 in narcotics proceeds to Valentin on February 6, 2018. Based on these messages, officers had a strong basis to suspect that Martinez was involved in the drug trade.

Second, officers observed Martinez's meeting with Guzman. The day before the February 13th meeting, officers intercepted messages where Guzman introduced himself to Martinez as a "friend of Fidel" and inquired about going to get a bite to eat at a restaurant with Martinez. Officers intercepted further messages, also on February 12, 2018, between Bolas and Martinez confirming that Martinez would receive two to four kilograms of unspecified narcotics from the drug courier. But when they arrived at the meeting on February 13th, Guzman and Martinez didn't patronize any businesses. Instead, they met very briefly in a parking lot, Martinez got out

of his car and opened the passenger side of Guzman's vehicle and the two interacted briefly, and then departed very quickly thereafter. Based on the combination of these facts, Officers had a strong and articulable belief that Guzman was the drug courier that Bolas had arranged for Martinez to meet with.

Third, having learned that Guzman was likely a drug courier, the subsequent meeting between Guzman and the Defendant further led officers to believe that the two engaged in a narcotics transaction. To start, Guzman conducted a narcotics transaction with Martinez roughly 30 minutes earlier. And like his prior meeting, Guzman met Defendant in a parking lot for only a few minutes, didn't patronize any surrounding businesses, and quickly departed thereafter. This meeting was remarkably like the two other prior transactions that officers believed to be drug related, and this meeting effectively confirmed Guzman's *modus operandi* for conducting narcotics transactions. Moreover, after Guzman left, officers observed the Defendant exit his car and appear to adjust something near the floorboard of the driver's seat. This activity, while innocuous on its own, added to the other facts that gave rise to a reasonable suspicion that Guzman and the Defendant conducted a narcotics transaction. *See United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) ("Further, we recognize that certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play.").

Defendant argues that officers lacked reasonable suspicion because they didn't observe any interactions between him and Martinez (the initial subject of the investigation), his contact with Guzman was *de minimus*, officers didn't observe any physical exchange of goods between the Defendant and Guzman, and the only evidence officers had was the Defendant adjusting something near the driver-side floorboard which could have been any number of things. None of

9

these arguments are persuasive. While it is true that the Defendant did not interact with Martinez, or any individual other than Guzman, officers personally observed a suspicious meeting between the Defendant and someone they strongly suspected to be a drug courier. The meeting between the Defendant and Guzman was conducted in a manner similar to other previous narcotics transactions. Moreover, the Court does not analyze the meeting between Guzman and the Defendant in a vacuum. Although this meeting on its own might have appeared innocuous, the Court must consider all the information known to the officers at the time.

Defendant attempts to analogize this case to the facts of *United States v. Ingrao*—albeit in the context of his probable cause argument—but this analogy is misplaced. In *Ingrao*, the Seventh Circuit held that officers did not have probable cause to stop and arrest a man after officers observed him carrying a bag down a gangway previously used in a suspicious transaction. 897 F.2d 860 (7th Cir. 1990). *Ingrao* is distinguishable for several reasons. First, the defendant in *Ingrao* didn't have any direct contact with the suspected drug dealer that officers observed; but here, the Defendant interacted with Guzman, a suspected drug courier, and officers saw this interaction.

Second, *Ingrao* speaks to the standard applicable to probable cause, not reasonable suspicion. In fact, the Seventh Circuit stated, "We take no position as to whether that suspicion would have been sufficient to support a valid *Terry* stop but conclusively believe that it was insufficient to support the intrusion of a full-blown arrest." *Id.* at 865-66. *Ingrao*, therefore, offers little in the context of analyzing the reasonable suspicion standard.

Third, unlike in *Ingrao*, officers in this case had more than just, as the Seventh Circuit put it, "furtive gestures," to raise suspicion. Indeed, the Seventh Circuit accepted that the *Ingrao* defendant's actions—looking left and right as he crossed the street, opening his trunk, and

entering his car—were suspicious but simply found that fact to be insufficient in the absence of any other supporting evidence to demonstrate probable cause. 897 F.2d at 864. But that is not the case here. Their knowledge of the investigation, coupled with their observations of the Defendant engaging in an unusual manner with a suspected drug courier, gave officers reasonable suspicion that the Defendant had engaged in illegal activity and justified the stop.

## II.    Consent

Having concluded that officers had reasonable suspicion to conduct an investigatory stop, the Court now turns to the consent issue. The Fourth Amendment bars searches conducted without a warrant issued upon probable cause, absent a few specifically delineated and well-defined exceptions. *Vinson v. Vermillion County, Illinois*, 776 F.2d 924, 929 (7th Cir. 2015). One of those exceptions is consent. *Id.*

Here, the Court finds that the Defendant consented to a search of his vehicle. Officers Boehnke and Savarino both testified that the Defendant gave consent to search his car after officers pulled him over. Although their testimony differed slightly, the Court finds these discrepancies *de minimus* and expected considering that this incident occurred over three years ago. Overall, the Court finds the officers' testimony credible.

Defendant argues that officers did not request consent to search his car and that he is not fluent in English. In support, Defendant provides an affidavit attesting to these facts. The Court does not find Defendant's affidavit credible. First, the two officers directly contradicted Defendant's argument that he did not give consent and, as previously stated, the Court finds that testimony credible. Second, with respect to Defendant's English-fluency argument, the video evidence provided during the hearing clearly shows that the Defendant understands English at a proficient level even if he is not fluent. The video shows the Defendant answering questions

11

posed to him in English to assist officer Savarino in filling out a biological information form. Although some of the audio is muffled, the video clearly demonstrates that Defendant had no issues understanding English. Therefore, the Court finds that the Defendant understood the officers' questioning in English and knowingly consented to the search of his car.

## Conclusion

For the reasons stated above, the Court denies Defendant's motion to suppress [119].

**SO ORDERED.**                                    **ENTERED:   August 3, 2021**

                                                                                    _____
                                                                                    **JORGE L. ALONSO**
                                                                                    **United States District Judge**